# EXHIBIT 3

must file a petition within 15 days after
the date of this opinion [Rule 27b].

Any party desiring a hearing by the
Supreme Court must file a petition be-
tween 30 and 40 days after the date of
this opinion [Rule 28b].

NOT TO BE PUBLISHED

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL SCOTT JONES,<br><br>    Defendant and Appellant. | 2d Crim. No. B047476<br>(Super.Ct. No. CR24985)<br>(Ventura County)<br><br>COURT OF APPEAL - SECOND DIST.<br><br>F I L E D<br>ROBERT N. WILSON  MAR 21 1991  Clerk<br><br>Deputy Clerk |

Michael Scott Jones was charged with one count
of first degree murder (Pen. Code,[1] § 187, subd. (a)),
and personal use of a firearm (§ 12022.5).  During trial
the court granted Jones' motion for acquittal of first
degree murder.  A jury convicted Jones of second degree
murder and found the firearm allegation to be true.
Jones appeals contending the court made a number of
errors in instructing the jury.  We affirm.

FACTS

Jones lived in a house with two roommates, Alex
Morrissey and the victim, Thomas Day.  Morrissey was new
to the house, but Jones and Day had been roommates for

_____

    [1]  All statutory references are to the Penal Code
unless otherwise stated.

2.

about two years. Although Jones and Day were friends, they had fights on occasion.

On the evening of May 29, 1989, Jones spent several hours with friends drinking in a bar. One of the friends described him as being a little loud, but acting normal. The group left the bar and went to the home of Bernie Hoffard who lived across the street from Jones and Day. A friend drove Jones to Hoffard's house. On the way Jones showed a revolver to the friend stating that he needed the gun for protection and asked that the gun not be mentioned to anyone.

At Hoffard's house the group played cards and continued to drink beer. Jones was coherent, his speech was not slurred and he had no problem with minor skills. Although he seemed a little angry and intoxicated, he was not out of control.

Hoffard's brother complained about the noise at about 3 a.m., and the party moved to Jones' house across the street. The card playing and beer drinking continued there until Day came out of his room to complain about the noise. Jones told Day that he paid rent too and was entitled to invite people to his house. Jones and Day locked arms. Hoffard suggested that the party move back

3.

to his house, but recommended that Jones call it an
evening and stay home. Jones complied, and the others
left. Morrissey, the third roommate, heard Day tell
Jones, "'Thirty days and you are out of here.'"

Morrissey and several neighbors heard the sound
of gun shots. Then Day knocked on Morrissey's door and
asked him to call an ambulance. By the time the
ambulance arrived, Day had stopped breathing and could
not be revived.

Jones left the house, and took a bicycle from a
neighbor's garage. A police officer saw Jones riding the
bicycle without any apparent balance problems. Jones
jumped off the bicycle and began running when the officer
approached. Another officer tackled Jones, and a gun
skidded away from Jones' body. After he was arrested, he
told the police that he did society a favor. Several
days later he told a friend that he knew what he was
doing and "the dick head deserved it."

An autopsy performed on Day disclosed that he
had been shot five times, and that several shots had been
fired into his back. A comforter removed from Day's
bedroom contained several bullet holes caused by a gun
fired somewhere between contact and four inches away. No

4.

alcohol or illegal narcotics were found to be present in Day's body.

Jones did not testify at his trial. However, evidence introduced in his defense disclosed the following:

Jones began to see Renee Grimes in December of 1988, but after a few months the relationship deteriorated. Nevertheless, Jones remained infatuated with Grimes and was upset because she did not want to be his girlfriend. Also, during the few weeks prior to the shooting, Jones had missed some work because of drinking, and was exceptionally irritable on the job. His boss told him to take a couple of weeks off. Adding to the emotional upset was Day's statement that Jones had 30 days to be out of the house.

A psychologist testified that Jones had a low estimate of his own worth and poor coping skills. Losing a girlfriend, a job and a place to live overwhelmed his ability to cope.

At 6:30 a.m. on May 20, Jones' blood alcohol was .26 percent. Thus, his blood alcohol at 4 a.m. was between .28 and .31 percent. An expert testified that alcohol substantially impairs judgment, perception and the ability to control impulses and emotions.

5.

DISCUSSION

I

Jones contends that the court erred in giving an instruction on second degree murder that did not expressly mention either malice or intent to kill. He is concerned because all of the instructions on states of mind that may have been of help to him referred either to malice or intent to kill.

In instructing the jury, the court defined murder as the unlawful killing of a human being with malice aforethought. (CALJIC No. 8.10[2/].) The court told the jury that ι.alice may either be express or implied; that malice is express when there is manifested an intention unlawfully to kill a human being; and that malice is implied when: the killing resulted from an intentional act, the natural consequences of the act are dangerous to human life, and the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. (CALJIC No. 8.11.)

The court gave the jury two definitions of

_____

[2/] All references to CALJIC instructions are to the Fifth edition (1988).

6.

second degree murder.  The first definition was from
CALJIC No. 8.30:  "Murder of the second degree is the
unlawful killing of a human being with malice
aforethought when there is manifested an intention
unlawfully to kill a human being but the evidence is
insufficient to establish deliberation and
premeditation."  This definition presents no problem for
Jones because it expressly mentions malice.

Of concern to Jones is the definition of second
degree murder given from CALJIC No. 8.31:  "Murder of the
second degree is [also] the unlawful killing of a human
being when:  [¶]  1.  The killing resulted from an
intentional act,  [¶]  2.  The natural consequences of
the act are dangerous to human life, and  [¶]  3.  The
act was deliberately performed with knowledge of the
danger to, and with conscious disregard for, human life.
[¶]  When the killing is the direct result of such an
act, it is not necessary to establish that the defendant
intended that his act would result in the death of a
human being."

Although CALJIC No. 8.31 does not employ the
word "malice," this need not concern Jones.  CALJIC No.
8.31 contains the very same words used by the court to

7.

instruct the jury on the definition of implied malice.
(CALJIC No. 8.11.)  The instructions must be read as a
whole (People v. Crandell (1988) 46 Cal.3d 833, 874), and
we must assume that jurors are capable of understanding
and correlating all jury instructions that are given
(People v. Kegler (1987) 197 Cal.App.3d 72, 80).  Thus
the jury, having been given the definition of murder
containing the same words used to define implied malice,
would understand that a finding of implied malice was
necessary to convict Jones of murder under CALJIC No.
8.31.  The jury would further understand that all of the
instructions applicable to malice, such as CALJIC No.
3.31 requiring the concurrence of act and mental state,
CALJIC No. 4.21 on voluntary intoxication, and CALJIC No.
2.02 on circumstantial evidence used to prove a mental
state, apply to the finding of implied malice required by
CALJIC No. 8.31 for a murder conviction.

For similar reasons, it was not necessary for
the court to specifically instruct the jury that
mitigating circumstances such as heat of passion or
sudden quarrel could reduce the type of murder described
in CALJLC No. 8.31 to manslaughter.  The court's general
instructions on the relationship among murder, malice and
manslaughter were sufficient.

8.

II

Jones contends the court erred in failing to give a jury instruction requested by him that informed the jury of the type of voluntary manslaughter that exists where malice is lacking due to voluntary intoxication.

Jones relies on People v. Graham (1969) 71 Cal.2d 303, 315, and People v. Castillo (1969) 70 Cal.2d 264, 269-271, for the proposition that it was error not to explicitly instruct the jury that it should find the defendant guilty of manslaughter rather than murder if it determined that malice was rebutted by evidenc; of voluntary intoxication.

Both Graham and Castillo involved the defense of diminished capacity.  Assuming that those cases are applicable here (see § 25, subd. (a)), we find no reason to reverse.  "[E]rroneous failure to instruct on a lesser included offense is not prejudicial if 'it is possible to determine that . . . the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. . . .'  [Citations.]"  (People v. Turner (1990) 50 Cal.3d 668, 690-691.)

9.

Here, although the instructions did not
expressly link manslaughter to voluntary intoxication,
the court properly instructed the jury that voluntary
manslaughter is the unlawful killing of another human
being without malice aforethought but with an intent to
kill (CALJIC No. 8.40); that murder requires malice but
manslaughter does not (CALJIC No. 8.50); and that
voluntary intoxication may negate the mental state of
malice (CALJIC No. 4.21).

Because the jury under properly given
instructions found Jones guilty of murder, it necessarily
found the factual question of malice adversely to him.
Thus he was not prejudiced by any erroneous failure to
instruct on manslaughter.   (See <u>People</u> v. <u>Matta</u> (1976) 57
Cal.App.3d 472, 483.)

III

Jones contends the trial court erred when it
gave CALJIC No. 8.44, the standard instruction on heat of
passion, instead of the instruction proposed by Jones.

CALJIC No. 8.44 provides:   "Neither fear,
revenge, nor the emotion induced by and accompanying or
following an intent to commit a felony, nor any or all of
these emotional states, in and of themselves, constitute

10.

the heat of passion referred to in the law of
manslaughter.  Any or all of such emotions may be
involved in a heat of passion that causes judgment to
give way to impulse and rashness.  Also any one or more
of them may exist in the mind of a person who acts
deliberately and from choice, whether such choice is
reasonable or unreasonable."

Instead of CALJIC No. 8.44, Jones proposed the
following:  "The passion necessary to constitute heat of
passion need not mean rage or anger, but may be any
violent, intense, overwrought or enthusiastic emotion
which causes a person to act rashly and without
deliberation and reflection.  [¶]  No specific type of
provocation is required to generate the passion necessary
to constitute heat of passion, and verbal provocation may
be sufficient."

He complains that CALJIC No. 8.44 is too
general; describes only those emotions that could not
constitute heat of passion rather than those emotions
that could; and refers to fear and revenge, emotions not
involved in this case.

On the other hand, Jones claims that the
language of his proposed instruction was taken directly

11.

from California court opinions (citing <u>People</u> v. <u>Berry</u>
(1976) 18 Cal.3d 509, 515; <u>People</u> v. <u>Borchers</u> (1958) 50
Cal.2d 321, 329), and was far more relevant to the facts
of this case in that it described the type of passion he
felt.

The defendant is entitled to an instruction that
pinpoints not specific evidence but the theory of the
defendant's case. (<u>People</u> v. <u>Wright</u> (1988) 45 Cal.3d
1126, 1137.) CALJIC No. 8.44 was sufficient to do that.

The instruction given by the court told the jury
that the existence of any particular emotion in and of
itself is not sufficient to constitute heat of passion,
but any emotion that causes judgment to give way to
impulse and rashness may be sufficient. This is
essentially the same as the first paragraph of Jones'
proposed instruction. Although CALJIC No. 8.44 is silent
about whether verbal provocation is sufficient to
generate heat of passion, we do not find that it is
reasonably probable had the jury been so instructed a
result more favorable to Jones would have resulted. Any
error in failing to give Jones' proposed instruction was
harmless. (<u>People</u> v. <u>Wright</u>, <u>supra</u>, 45 Cal.3d at p.
1144.)

12.

IV

After instructing the jury on the elements of murder, the court in separate instructions told the jury that the prosecution must prove the intoxication was not to the degree sufficient to negate malice (CALJIC No. 4.21), and that the act which caused the death was not done in the heat of passion or upon a sudden quarrel (CALJIC No. 8.50). The intoxication instruction was given immediately after the instructions defining murder and malice, but a number of instructions intervened before the heat of passion or sudden quarrel instruction was given.

Jones contends it was error for the court not to give a unified murder instruction that included intoxication, heat of passion and sudden quarrel as elements militating against a finding of malice. He concedes there are no California cases to support the requirement of all inclusive instructions, but he relies on cases from other jurisdictions. (Citing State v. Emmanuel (Wash.Sup.Ct. 1953) 259 P.2d 845, 857; Lawson v. State (Tex.Ct.App. 1989) 775 S.W.2d 495, 497.)

Here the jury was told to consider the instructions as a whole (CALJIC No. 1.01), and we must

13.

presume the jury is capable of understanding and correlating all instructions that are given. (<u>People</u> v. <u>Kegler</u>, <u>supra</u>, 197 Cal.App.3d at p. 80.) Whatever the rule may be in other jurisdictions, we see no need for adopting a requirement for all-inclusive instructions.

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

GILBERT, J.

We concur:

STONE, P. J.

YEGAN, J.

14.

Lawrence Storch, Judge

Superior Court County of Ventura

_____

Maureen DeMaio under appointment by the Court of Appeal for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Senior Assistant Attorney General, Thomas L. Willhite, Jr., Supervising Deputy Attorney General, Kenneth C. Byrne, Deputy Attorney General, for Plaintiff and Respondent.