# EXHIBIT 4

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )          CDC Number E-40401
                          )
MICHAEL JONES             )
                          )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 1, 2006

1:40 P.M.


PANEL PRESENT:

JACK GARNER, Presiding Commissioner
NOREEN BLONIEN, Deputy Commissioner

OTHERS PRESENT:

MICHAEL JONES, Inmate
MARY ANN TARDIFF, Attorney for Inmate
TWO CORRECTIONAL OFFICERS, Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum


**Ramona Cota**              **Peters Shorthand Reporting**

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 7 |
| Pre-Commitment Factors | 16 |
| Post-Commitment Factors | 27 |
| Parole Plans | 23 |
| Closing Statements | 49 |
| Recess | 58 |
| Decision | 59 |
| Adjournment | 67 |
| Transcriber Certification | 68 |

--oOo--

1

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **DEPUTY COMMISSIONER BLONIEN:**  We're on |
| 3 | record. |
| 4 | **PRESIDING COMMISSIONER GARNER:**  Okay, |
| 5 | this is a Subsequent Parole Consideration |
| 6 | Hearing for Michael Jones, J-O-N-E-S, CDC number |
| 7 | E like Edward 40401.  The date today is May 1, |
| 8 | 2006, it is 1:40 p.m. and we are located at the |
| 9 | Correctional Training Facility in Soledad.  The |
| 10 | inmate was received on December 21, 1989.  The |
| 11 | life term started on September 2, 1990. |
| 12 | Received from Ventura County.  The offense is |
| 13 | murder in the second degree with the use of a |
| 14 | firearm.  The case number is C like Charles, R |
| 15 | like Robert 24985.  Count number one PC 187 and |
| 16 | 12022.5.  The term was 15 years to life plus 2, |
| 17 | 2 years, and the minimum eligible parole date is |
| 18 | September 1, 2000.  This hearing is going to be |
| 19 | tape-recorded and for purposes of voice |
| 20 | identification each of us at the table is going |
| 21 | to be required to state our first name, last |
| 22 | name, spelling the last name.  And when we get |
| 23 | to you, Mr. Jones, if you'd also include your |
| 24 | CDC number.  I'll start and go to my left.  I'm |
| 25 | Jack Garner, G-A-R-N-E-R, Commissioner. |
| 26 | **DEPUTY COMMISSIONER BLONIEN:**  I'm Noreen |
| 27 | Blonien, B-L-O-N-I-E-N, I'm a Deputy |

2

1   Commissioner.

2        **ATTORNEY TARDIFF:**  Mary Ann Tardiff, T-A-

3   R-D-I double F, attorney for Mr. Jones.

4        **INMATE JONES:**  Mike Jones, J-O-N-E-S, CDC

5   number E-40401.

6        **PRESIDING COMMISSIONER GARNER:**  Okay,

7   thank you.  And for the record, we do have two

8   correctional peace officers in the room for

9   purposes of security.  Okay, Mr. Jones and

10  Ms. Tardiff, I have a BTB (sic) 1073, this is

11  the reasonable accommodation form that you

12  signed back in October of 2004.  At that time

13  you indicated you don't have a disability and

14  that other than legal representation that you

15  didn't need any help for the hearing.  A little

16  bit of time has elapsed since then.  Have you

17  had any conditions or anything develop that we

18  need to provide an accommodation for today?

19       **INMATE JONES:**  No sir.

20       **PRESIDING COMMISSIONER GARNER:**  Okay.

21  Are you on any medications?

22       **INMATE JONES:**  No sir.

23       **PRESIDING COMMISSIONER GARNER:**  None at

24  all?

25       **INMATE JONES:**  No.

26       **PRESIDING COMMISSIONER GARNER:**  Okay.  So

27  we're ready to go?  This hearing is being

3

1  conducted pursuant to Penal Code Section 3041

2  and 3042 and the rules and regulations of the

3  Board of Parole Hearings governing parole

4  consideration hearings for life inmates.  The

5  purpose of today's hearing is to consider your

6  suitability for parole.  In doing so we will

7  consider the number and nature of the crimes you

8  were committed for, your prior criminal and

9  social history and your behavior and programming

10  since your commitment.  We have had the

11  opportunity to review your Central File and your

12  prior hearing transcript.  You will be given an

13  opportunity to correct or clarify the record.

14  We will consider your progress since your

15  commitment and since your last hearing.  Your

16  updated counselor's report and psychological

17  report will also be considered.  And any change

18  in parole plans should be brought to our

19  attention.  We will reach a decision today and

20  inform you whether or not we find you suitable

21  for parole and the reasons for our decision.  If

22  you are found suitable for parole the length of

23  your confinement will be explained to you.  This

24  hearing will be conducted in two phases.  I will

25  discuss with you the crime you were committed

26  for, your prior criminal and social history,

27  your parole plans and any letters of support or

4

1   opposition that may be in the file.

2   Commissioner Blonien will discuss with you your

3   progress since your commitment, your counselor's

4   report and your psychological evaluation.  Once

5   that is concluded the Commissioners and your

6   attorney will be given an opportunity to ask you

7   questions.  The questions -- Excuse me.  Before

8   we recess for deliberations your attorney and

9   you will be given an opportunity to make a final

10  statement regarding your parole suitability.

11  Your statement should be directed to why you

12  feel you are suitable for parole.  We will then

13  recess, clear the room and deliberate.  Once we

14  have completed our deliberations we will resume

15  the hearing and announce our decision.  The

16  California Code of Regulations states,

17  regardless of time served a life inmate shall be

18  found unsuitable for and denied parole if in the

19  judgment of the panel the inmate would pose an

20  unreasonable risk of danger to society if

21  released from prison.  Now, Mr. Jones, you had

22  certain rights.  And the rights included a

23  timely notice to the hearing, the right to

24  review your Central File and the right to

25  present relevant documents.  And I would ask you

26  at this time, have those rights been met, sir?

27          **INMATE JONES:**  Yes sir.

5

1        **PRESIDING COMMISSIONER GARNER:**    Okay.

2    You also have a right to be heard by an

3    impartial panel.    Today the panel that you have

4    drawn is myself and Commissioner Blonien.    Any

5    objections to the panel?

6        **INMATE JONES:**    Excuse me.    No sir.

7        **PRESIDING COMMISSIONER GARNER:**    Okay.

8    You will receive a copy of our written tentative

9    decision today.    It will become effective within

10   120 days and a copy of the tentative decision

11   and a copy of the transcript will be sent to

12   you.    You might recall from previous Boards, in

13   May 2004 the appeal procedures changed requiring

14   you now to go through the courts.    You're aware

15   of that?

16       **INMATE JONES:**    Yes sir.

17       **PRESIDING COMMISSIONER GARNER:**    Thank

18   you.    You are not required to admit your offense

19   or discuss your offense if you do not wish to do

20   so.    However, this panel does accept as true the

21   findings of the court and you are invited to

22   discuss the facts and circumstances of the

23   offense if you desire.    The Board will review

24   and consider any prior statements you have made

25   regarding the offense in determining your

26   suitability for parole.    And at this time I will

27   ask Commissioner Blonien if there is

6

1  confidential material in your C File and if

2  we'll be using it at the hearing today?

3          DEPUTY COMMISSIONER BLONIEN:  There is no

4  information in the C File that's confidential

5  information.

6          PRESIDING COMMISSIONER GARNER:  Okay,

7  thank you.  Ms. Tardiff, is the hearing

8  checklist all okay?

9          ATTORNEY TARDIFF:  Yes it is, sir, thank

10 you.

11         PRESIDING COMMISSIONER GARNER:  Okay,

12 great, thanks.  Okay.  Beyond the documents you

13 presented to each of earlier anything else?

14         ATTORNEY TARDIFF:  No.

15         PRESIDING COMMISSIONER GARNER:  Okay.

16 Any preliminary objections?

17         ATTORNEY TARDIFF:  None.

18         PRESIDING COMMISSIONER GARNER:  And will

19 Mr. Jones be speaking with us today?

20         ATTORNEY TARDIFF:  He will.

21         PRESIDING COMMISSIONER GARNER:  All

22 matters?

23         ATTORNEY TARDIFF:  Yes.

24         PRESIDING COMMISSIONER GARNER:  Okay.  If

25 I could get you to raise your right hand,

26 Mr. Jones.  Do you solemnly swear or affirm that

27 the testimony you give at this hearing will be

7

1  the truth, the whole truth and nothing but the

2  truth?

3        **INMATE JONES:**  Yes I do.

4        **PRESIDING COMMISSIONER GARNER:**  Thank you

5  very much.  Okay, at this time I am going to

6  read into the record a summary of the commitment

7  offense.  And I am going to have to refer back

8  to the November 2003 Board since subsequent

9  Boards reference that date.  And this was a

10  report that was prepared by Correctional

11  Counselor I initial W Poole, P-O-O-L-E.

12        "Michael Scott Jones lived in a

13        house with two roommates, Alex

14        Morrissey, M-O-R-R-I-S-S-E-Y, and

15        the victim, Thomas Day, D-A-Y.

16        Morrissey was -- Morrissey was to

17        house but Jones and Day had been

18        roommates for about two years.

19        Although Jones and Day were

20        friends they had fights on

21        occasion."

22  And I have it scratched out here.  It says 29th

23  but it's scratched out to the 19th, which I

24  think is probably the evening before the event.

25  Is that correct?

26        **INMATE JONES:**  Yes.

27        **PRESIDING COMMISSIONER GARNER:**  Okay.

8

| | |
|---|---|
| 1 | "On the evening of May 19, 1989 |
| 2 | Jones spent several hours with |
| 3 | friends, describing him as being a |
| 4 | little loud but acting normal. |
| 5 | The group left the bar and went to |
| 6 | the home of Bernie, B-E-R-N-I-E, |
| 7 | Hoffard, H-O-F-F-A-R-D, who lived |
| 8 | across the street from Jones and |
| 9 | Day. A friend drove Jones to |
| 10 | Hoffard's house. On the way Jones |
| 11 | showed a revolver to the friend |
| 12 | and stated that he needed a gun |
| 13 | for protection and asked that the |
| 14 | gun not be mentioned to anyone. |
| 15 | At Hoffard's house the group |
| 16 | played cards and continued to |
| 17 | drink beer. Jones was coherent, |
| 18 | his speech was not slurred and he |
| 19 | had no problem with minor skills. |
| 20 | Although he seemed a little angry |
| 21 | and intoxicated he wasn't out of |
| 22 | control. Hoffard's brother |
| 23 | complained about the noise at |
| 24 | about three a.m. and the party was |
| 25 | moved to Jones' house across the |
| 26 | street. The card playing and beer |
| 27 | drinking continued there until Day |

```
 1        came out of his room to complain
 2        about the noise.  Jones told Day
 3        that he paid rent too and was
 4        entitled to invite people to his
 5        house.  Jones and Day locked arms.
 6        Hoffard suggested the party move
 7        back to his house but recommended
 8        that Jones call it an evening and
 9        stay home.  Jones complied and the
10        others left.  Morrissey, the third
11        roommate, heard Day tell Jones, 30
12        days and you're out of here.
13        Morrissey and several neighbors
14        heard the sounds of gunshot then
15        Day knocked on Morrissey's door
16        and asked him to call the
17        ambulance.  By the time the
18        ambulance arrived Day had stopped
19        breathing and could not be
20        revived.  Jones left the house and
21        took a bicycle from a neighbor's
22        garage.  A police officer saw
23        Jones riding the bicycle without
24        any apparent balance problems.
25        Jones jumped off the bicycle and
26        began running when the officer
27        approached.  Another officer
```

10

```
 1          tackled Jones and a gun skidded
 2          away from Jones' body.  After he
 3          was arrested he told police that
 4          he did society a favor.  Several
 5          days later he told a friend that
 6          he knew what he was doing and,
 7          quote, the dickhead deserved it,
 8          end quote."
```
 9  Okay, Mr. Jones, that's a rather brief summary
10  of the offense.  But let me ask you to start
11  things out, is that a pretty accurate version of
12  what occurred?

13          **INMATE JONES:**  I need to tell you that
14  there's a lot that I don't remember from the
15  actual night because I was so intoxicated.  And
16  a lot of what I do know and what I remember is
17  from reports from like what you just read and
18  other things that I've found out through
19  probation reports and the court's transcripts.
20  So if that's what they say happened I'm not
21  going to disagree with that at all.

22          **PRESIDING COMMISSIONER GARNER:**  Okay.
23  Well, let me ask you then to see what levels of
24  recollection you did have.  Do you remember
25  drinking on or about that date, May 19?

26          **INMATE JONES:**  Yes.

27          **PRESIDING COMMISSIONER GARNER:**  And at

11

1    that time apparently, it appears anyway from

2    here, that beer was your alcohol of choice.

3         INMATE JONES:    That's what I usually

4    would start with, yes.

5         PRESIDING COMMISSIONER GARNER:    And then

6    you would switch over to something a little

7    harder?

8         INMATE JONES:    Yes.

9         PRESIDING COMMISSIONER GARNER:    Did you

10   have choice in that?

11        INMATE JONES:    It was either vodka or

12   rum.

13        PRESIDING COMMISSIONER GARNER:    Okay.

14   And you were a roommate of the victim, correct?

15        INMATE JONES:    Yes.

16        PRESIDING COMMISSIONER GARNER:    And that

17   you were in possession of a weapon.

18        INMATE JONES:    Yes.

19        PRESIDING COMMISSIONER GARNER:    Do you

20   recall mentioning to the friend that drove you

21   over to Hoffard's house that you needed the gun

22   for protection?

23        INMATE JONES:    No.

24        PRESIDING COMMISSIONER GARNER:    You don't

25   remember that?  Why did you have the gun?

26        INMATE JONES:    You know I've tried to ask

27   myself this question over the years and there

12

1   really is no reason for me to have had the gun.

2   There really isn't, I've never carried a gun

3   before.   That was the first time in my life.

4   And there's no good reason.

5           PRESIDING COMMISSIONER GARNER:   Okay, do

6   you remember where you bought it.

7           INMATE JONES:   Yeah, it was a next door

8   neighbor.

9           PRESIDING COMMISSIONER GARNER:   And what

10   kind of gun was it?

11          INMATE JONES:   It was a .38.

12          PRESIDING COMMISSIONER GARNER:   What

13   barrel length?

14          INMATE JONES:   I have no, I don't know

15   those type of things.

16          PRESIDING COMMISSIONER GARNER:   After you

17   purchased the weapon did you ever fire it at a

18   range or target shooting or anything like that?

19          INMATE JONES:   Yes.

20          PRESIDING COMMISSIONER GARNER:   So you

21   knew how the gun worked?

22          INMATE JONES:   Yeah.

23          PRESIDING COMMISSIONER GARNER:   Okay.

24   And so you normally didn't carry the gun?

25          INMATE JONES:   No, never.

26          PRESIDING COMMISSIONER GARNER:   And do

27   you have any recollection why this particular

13

1   evening you had it?

2        INMATE JONES:   No.

3        PRESIDING COMMISSIONER GARNER:   Okay.   Do

4   you have any recollection of an argument with

5   the victim Mr. Day?

6        INMATE JONES:   No.

7        PRESIDING COMMISSIONER GARNER:   None at

8   all?

9        INMATE JONES:   No.   I didn't, as far as I

10  knew Tom was out of town.   I didn't even know

11  that he was back.   He was, been vacationing in

12  Florida.

13       PRESIDING COMMISSIONER GARNER:   Do you

14  have any recollection of shifting the party from

15  one side of the street to the other?

16       INMATE JONES:   No.

17       PRESIDING COMMISSIONER GARNER:   Okay.

18  And how long on that day had you been drinking?

19       INMATE JONES:   We started at about noon

20  that day.   And I think the crime happened at

21  like two o'clock in the morning, something like

22  that.

23       PRESIDING COMMISSIONER GARNER:   So pretty

24  much continuously from about noon?

25       INMATE JONES:   Yes sir.

26       PRESIDING COMMISSIONER GARNER:   Okay.

27  And do you have any recollection of firing the

14

1  gun that evening?

2         INMATE JONES:  No.

3         PRESIDING COMMISSIONER GARNER:  You don't

4  remember any sound or anything like that?

5         INMATE JONES:  No.

6         PRESIDING COMMISSIONER GARNER:  Remember

7  being tackled by a police officer?

8         INMATE JONES:  No.

9         PRESIDING COMMISSIONER GARNER:  So let me

10  ask you, what was your first recollection after

11  this occurred?

12         INMATE JONES:  I remember we were at a

13  like a tool convention.  We left work early.

14  And we started drinking there.  And then I drove

15  home.  And I know I went to the first bar and

16  started drinking there.  And then went from

17  there to the liquor store to get some more

18  liquor and went home.  And I remember some

19  friends coming and asking if I wanted to go to

20  some other bars with them.  And I said, okay.

21  And I remember going over to their house.  And

22  that's about where it ends.  I mean I remember

23  maybe going from one bar to the next.  But other

24  than that I don't remember much.  They say that

25  I went by taxi.  I have no idea remembering

26  that.

27         PRESIDING COMMISSIONER GARNER:  Okay.

15

1      **INMATE JONES:**    I don't remember coming

2    home to go into Bernie's house to play cards.

3    And I never remember going back to my home and

4    confronting Tom whatsoever.    And I know, you

5    know, it might seem like that I'm just trying to

6    avoid something here but I need to make this

7    point clear that I'm not.    I generally because

8    that was the type of style drinker that I was.

9    I would just drink as hard and as fast as I

10    could to get as drunk as I could.    And the

11    record shows that I was pretty intoxicated.    I

12    think it's between .28 and 3, 2 of the time when

13    they took the blood test.    And I just can't

14    stress enough, you know, it's not that I'm

15    trying to avoid talking about it.    I take full

16    responsibility for my actions.    Whatever the

17    record says is true I'm not going to dispute

18    that.    But I hope you will believe me here today

19    when I tell you that I just don't remember.

20      **PRESIDING COMMISSIONER GARNER:**    Okay.    So

21    after this occurred at some point you either

22    woke up or you had some recollection of being in

23    jail.    When was that?

24      **INMATE JONES:**    I imagine that was the

25    next day.

26      **PRESIDING COMMISSIONER GARNER:**    Okay.

27    And when did you first learn that Mr. Day was

16

1  dead?

2      **INMATE JONES:**  I can't  remember if it

3  was either one of the officers or it was my

4  family that came there to visit me and they told

5  me.

6      **PRESIDING COMMISSIONER GARNER:**  And just

7  so you had mentioned it for the record the

8  indication is that at 6:30 a.m. your blood

9  alcohol was .26 and they did an estimate to

10  factor it back to 4:00 a.m. by putting it

11  between .28 to .31.  Okay.  Looks like you

12  didn't have a juvenile record at all?

13      **INMATE JONES:**  No.

14      **PRESIDING COMMISSIONER GARNER:**  No

15  juvenile record.  And it looks like your only

16  other offense was a DUI.  Is that correct?

17      **INMATE JONES:**  Yeah.

18      **PRESIDING COMMISSIONER GARNER:**  That one

19  resulted in some jail time and a fine.  Actually

20  it, and then it looks like you also had a drunk

21  in public.  But that was just to let you sober

22  up and then release you.  And then you also

23  driving a motorcycle without a license.  Got

24  some probation on top of that.

25      **INMATE JONES:**  That's a point that if we

26  bring it up every time I don't know, I think

27  they're confusing that with the probation was

17

1    for the drunk driving and not the driving

2    without a license.  Because I always had a

3    license.  I may have not have had it on me at

4    that particular time but I think that was just

5    an error in the record there.

6          PRESIDING COMMISSIONER GARNER:  Okay.

7    Well nothing in violence.

8          INMATE JONES:  Exactly.

9          PRESIDING COMMISSIONER GARNER:  Okay.  So

10   far as your personal factors at the time this

11   report was written in 2003 you were 36.  Have

12   you reached 39 yet?

13         INMATE JONES:  Yeah, I'm 42.

14         PRESIDING COMMISSIONER GARNER:  Forty-

15   two, okay so then this was even old then. June

16   7, '63 born in San Bernardino.

17         INMATE JONES:  Correct.

18         PRESIDING COMMISSIONER GARNER:  And

19   you're the oldest of two children.  Looks like

20   your parents divorced when you were either

21   somewhere between seven and ten years of age.

22   And you kind of lived on and off with your

23   mother and father at different times?

24         INMATE JONES:  Yes.

25         PRESIDING COMMISSIONER GARNER:  What did

26   your folks do?

27         INMATE JONES:  I really couldn't tell you

18

1    what my mother did.  I don't remember.  I know

2    she worked.  I just don't remember what she did.

3    My father was a carpenter.  And he also was a

4    captain of yachts.

5            PRESIDING COMMISSIONER GARNER:  Did he

6    have a commercial rating?

7            INMATE JONES:  Well I don't know exactly

8    what he had.  He was a, I don't know if you're

9    aware they have what's called the TransPac Race

10   (phonetic).  It's a sailboat race from here to

11   Hawaii.  And the owners don't like bringing

12   their boats back because they have to go way up

13   north and it's not very pleasurable.  And they

14   pay people to do that.  And that's what he did.

15           PRESIDING COMMISSIONER GARNER:  Okay.

16           INMATE JONES:  And besides he owned his

17   own sailboat also.

18           PRESIDING COMMISSIONER GARNER:  Okay.  So

19   did you spend more time with your dad?

20           INMATE JONES:  From about the time I was

21   15 I lived exclusively with him.

22           PRESIDING COMMISSIONER GARNER:  Okay.

23   There's some indication that the family moved

24   around and you went to numerous elementary and

25   junior high schools?

26           INMATE JONES:  Yes.

27           PRESIDING COMMISSIONER GARNER:  What was

19

1   the nature of the moving around?

2        INMATE JONES:  I guess that would be my

3   mom and her new husband.  And then I moved to

4   Hawaii a couple of times when in between that

5   time that I lived exclusively with my dad.  My

6   dad was lived in Hawaii and me and my brother

7   moved over there to go live with him for a

8   couple of years.

9        PRESIDING COMMISSIONER GARNER:  Okay, you

10  went all the way through the eleventh grade and

11  then part of the twelfth.

12       INMATE JONES:  Yes.

13       PRESIDING COMMISSIONER GARNER:  What

14  happened there?

15       INMATE JONES:  I was expelled from high

16  school.

17       PRESIDING COMMISSIONER GARNER:  For --

18       INMATE JONES:  I don't know what the

19  official reasons would be.  I mean I don't

20  remember exactly I mean I know I had a hearing

21  and I went.  And it was because it was some

22  trouble with one of the teachers there.

23       PRESIDING COMMISSIONER GARNER:  Just not

24  getting along with the teacher or is it beyond

25  that.

26       INMATE JONES:  Disobeying them.

27       PRESIDING COMMISSIONER GARNER:  Okay.  Is

1    that only one teacher or more?

2        INMATE JONES:  Just one.

3        PRESIDING COMMISSIONER GARNER:  Just one.

4    Couldn't transfer out of that class?

5        INMATE JONES:  I asked, I asked to go to

6    a different continuation school.  And they said

7    no.  They --

8        PRESIDING COMMISSIONER GARNER:  Okay, you

9    got your GED in prison in '91.

10       INMATE JONES:  Yes.

11       PRESIDING COMMISSIONER GARNER:  And you

12   had indicated that your father was an alcohol

13   abuser?

14       INMATE JONES:  Yes.

15       PRESIDING COMMISSIONER GARNER:  And any

16   other kind of abuse in the house with him?

17       INMATE JONES:  No.

18       PRESIDING COMMISSIONER GARNER:  Physical,

19   none?

20       INMATE JONES:  No.

21       PRESIDING COMMISSIONER GARNER:  Did he

22   ever abuse your mother?

23       INMATE JONES:  Not my father, my

24   stepfather.

25       PRESIDING COMMISSIONER GARNER:  What did

26   your stepfather do?

27       INMATE JONES:  That would be Larry Wolfer

21

1  (phonetic).

2         **PRESIDING COMMISSIONER GARNER:**  What did

3  he do I mean.

4         **INMATE JONES:**  He used to beat my mother.

5         **PRESIDING COMMISSIONER GARNER:**  Oh okay.

6  And you started using drugs and alcohol about

7  the ninth grade?

8         **INMATE JONES:**  Yes.

9         **PRESIDING COMMISSIONER GARNER:**  And what

10  was your choice?

11         **INMATE JONES:**  I smoked marijuana and

12  later on I did a little bit of cocaine.

13         **PRESIDING COMMISSIONER GARNER:**  And no

14  history of military service.

15         **INMATE JONES:**  No.

16         **PRESIDING COMMISSIONER GARNER:**  Ever

17  hospitalized?

18         **INMATE JONES:**  No.

19         **PRESIDING COMMISSIONER GARNER:**  No

20  injuries, no illness?

21         **INMATE JONES:**  Broken arm.

22         **PRESIDING COMMISSIONER GARNER:**  Okay.

23  And employed by the Conejo Valley Farm for five

24  years.  What did you do for them?

25         **INMATE JONES:**  It's Conejo Valley

26  Framing.

27         **PRESIDING COMMISSIONER GARNER:**  Is it

22

1  framing?

2      **INMATE JONES:**  Yes.

3      **PRESIDING COMMISSIONER GARNER:**  That's a

4  bit of a difference.

5      **INMATE JONES:**  It's a typo there.

6      **PRESIDING COMMISSIONER GARNER:**  Okay.

7      **INMATE JONES:**  Don't feel bad, they

8  mention that every time.  I was a carpenter.

9      **PRESIDING COMMISSIONER GARNER:**  Okay.

10 Were you working at the time of this offense?

11     **INMATE JONES:**  Oh yeah.

12     **PRESIDING COMMISSIONER GARNER:**  Okay.

13 That ought to be fun for the transcriber (loud

14 alarm blaring in the background).

15     **INMATE JONES:**  I pretty much, I was

16 working since I was about 15 or 16.  I became an

17 emancipated minor and so I was pretty much

18 living on my own.  And I always had a job.  I

19 always had to pay my own rent, food, clothes so

20 I always had a job.

21     **PRESIDING COMMISSIONER GARNER:**  Okay.

22 Where did you live?

23     **INMATE JONES:**  My dad like I said, went

24 and --

25     **PRESIDING COMMISSIONER GARNER:**  When you

26 were on your own, excuse me.

27     **INMATE JONES:**  In Camarillo, between

23

1    Camarillo and Oxnard.

2          **PRESIDING COMMISSIONER GARNER:**    Okay, so

3    kind of down in the Ventura County area always?

4          **INMATE JONES:**    Right.

5          **PRESIDING COMMISSIONER GARNER:**    Okay.

6    Okay I did get some letters today that may

7    change this.    But at least back at that time the

8    report was written there was an indication that

9    you wanted to live with your uncle who is up in

10   Red Bluff.    And you also have a brother, Troy

11   Jones that has offered you residence.    And the

12   brother is in Gardena.    And that you'd like to

13   resume work as a carpenter or construction work.

14   So let's take a look and see what the letters

15   are.    I'll read the ones that were in the file

16   first and then the ones that were provided by

17   Ms. Tardiff after I get those done.    Okay the

18   first support letter is dated August 20, 2005.

19   It's a typed letter and it's signed by Tammy, T-

20   A-M-M-Y, Figueroa, F-I-G-U-E-R-O-A.    She's in

21   Running Springs, California.    First cousin to --

22   Your first cousin.    Didn't grow up close to you

23   because the parents weren't close.    About '90 or

24   '91 she heard that you were incarcerated,

25   saddened about what happened.    Decided to write

26   you not knowing if you would know who she was.

27   And that you've corresponded for two to three

24

1    years.  Visited a couple of times apparently
2    with your mother and then alone with a daughter.
3    And has talked with you on the phone. Speaks to
4    her of being a nurturer by nature.  And speaks
5    to her having, looks like she's got a number of
6    stepsons.  And a tough life as children of a
7    divorce and a verbally abusive mother.  And
8    apparently she got back in contact with you in
9    2003 and got an inspiring letter back.
10   Corresponded regularly since then.  Noticed the
11   changes she's seen.  How much you've grown.  And
12   makes some observations of positive manner over
13   the years.  Your being introduced to religion.
14   Kind of letting the new man take hold.  And
15   speaks to the understanding of the crime.  And
16   she wishes to take full responsibility for
17   Mike's release.  I'm a realtor for Century 21.
18   Started a side business rehabbing homes.  Could
19   use Mike as he has skills in carpentry.  My
20   husband owns his own framing business.  Could
21   use him as well.  Have a second home cabin in my
22   town that you could live in.  They'd help you
23   get a place until you get some money.  You could
24   live with them, however I guess one of their
25   kids, is it Paul that's one of their children?
26   Paul's living with them and they don't have an
27   additional room.  And it won't take you any time

25

```
 1   to get on your feet because you're not

 2   lackadaisical.  The next letter is dated

 3   December 19, 2004 and this is from a Donald

 4   Kuss, K-U-S-S.  He's your uncle.  Is writing in

 5   support.  Knows that you committed one of the

 6   worst crimes imaginable, taking the life of

 7   another human being.  That you've come to

 8   understand the serious nature of your offense

 9   and are remorseful.  Be willing to help him

10   become a good, upstanding citizen as he reenters

11   by allowing him to live with me while seeking

12   employment and a home of his own.  Realize after

13   being incarcerated for so many years it would be

14   a lot of work.  And I am willing to be

15   emotionally and mentally supportive as well.

16   And let's see your parole plans.  Right now the

17   parole plans are, is the, are they in the order.

18   Your first choice would be the Tehama County.

19          INMATE JONES:  No, no.  Tammy would be my

20   first choice.

21          PRESIDING COMMISSIONER GARNER:  Tammy

22   would be your first choice, all right.  First

23   choice would be in San Bernardino County and

24   that was the Tammy Figueroa that we previously

25   had read the letter into the file.  And that was

26   an offer of employment and housing.  And the

27   second backup is the letter from Don Kuss, K-U-
```

1   S-S in Red Bluff, California.   Also attached is

2   a resume that was dated 2006 speaking of the

3   object, summary of qualifications, work

4   experience, vocational training.   We have a

5   letter that is dated February 22, 2005.   This is

6   the initials C.N.C.A. 06 Bridging the Gap.   It's

7   Petaluma, California.   And it speaks to the

8   contact in the Red Bluff area.   And they

9   forwarded a request on that in the district.   It

10  should be hearing from them soon.   It's a

11  committee that's set up to help fellow

12  alcoholics and recovery and transition from

13  meetings on the inside of facilities into the

14  rooms of AA and homes in the community.   So this

15  was an identification of the closest AA

16  resource.   And that would have been in Redding,

17  California.   And a letter from Northern

18  California Inter-group of Alcoholics Anonymous,

19  Redding, California.   And this is in follow up

20  to the referral.   It's March 21, 2005.   It's

21  signed by Michael Sawyer, S-A-W-Y-E-R.   And he

22  introduces himself as the office manager.

23  Sending a copy of the meetings' schedule.   And

24  also that when your life is improved drastically

25  if you're willing to put in the practice of

26  suggestions offered by the Big Book.   And then

27  attached to that was the schedule of the

27

1   meetings for the Northern California Inter-

2   group, which includes a whole array of different

3   facilities that are located in upper northern

4   California.  We have these and these look like

5   originals so we'll make sure you get these back

6   today.  Let me also indicate that we did send

7   out the 3042 notices.  You may recall those are

8   the legal notices that went to all of the

9   agencies that had a direct involvement in your

10  case.  And there was a letter that was dated

11  April 19, 2006 from the office of the district

12  attorney from Ventura County.  It's signed by

13  Gregory Totten, T-O-T-T-E-N, the district

14  attorney.  Indicating basically, recommend the

15  inmate be found unsuitable for parole.  And that

16  is the only, that was the only letter that was

17  contained in the file.  Let me just double check

18  and see if there was one from any of the law

19  enforcement agencies other than the DA and it

20  doesn't look like it.  That's the only one.  So

21  at this time I'm going to ask you to direct your

22  attention to over here to Commissioner Blonien

23  who is going to talk about your post-conviction

24  factors.

25          **DEPUTY COMMISSIONER BLONIEN:**  So,

26  Mr. Jones, this is your third subsequent

27  hearing.  And your last appearance before the

28

1    Board was February 2nd of 2004 and the decision

2    was for a one year denial.  There have been two

3    postponements, one September 1st of '05 and one

4    for January 3rd of '06.  Both because of the

5    psych report.  In one it wasn't done and the

6    other where they didn't feel it addressed the

7    questions that the '04 Panel had asked.  And

8    we'll go over that.  They made the

9    recommendations that you remain disciplinary-

10   free and you continue your participation in

11   self-help.  Your custody level is Medium-A.

12   Your classification score is 19, which is the

13   lowest possible for a lifer inmate.  So in order

14   to do this report I read your counselor's report

15   by counselor Ellison, E-L-L-I-S-O-N dated

16   12/20/05.  I read the new psych report by

17   Dr. Macomber, M-A-C-O-M-B-E-R, dated January

18   14th of 2006.  I've gone through your C File and

19   I've gone through the Board Report.  And I note

20   that you went through the C File on 3/29/06 so

21   that was very recently.

22          **INMATE JONES:**  Yes.

23          **DEPUTY COMMISSIONER BLONIEN:**  So you

24   probably have it memorized too.  So I'm going to

25   discuss what you've been doing.  And you've made

26   it so much easier even by submitting a resume of

27   your program accomplishments.  And we'll have

29

1  some discussion on what you've done and what

2  your plans are.  Since you've been incarcerated

3  you've not received a 115.  And that is highly

4  difficult to do.  And I respect you greatly.

5          INMATE JONES:  Thank you.

6          DEPUTY COMMISSIONER BLONIEN:  For being

7  able to attain that.  You've had two minor

8  counseling chronos, the last one in 1992.

9  You've achieved vocational training in silk

10 screening but you really didn't need it because

11 you came in as a carpenter.  And you must be

12 pretty good because IDL has had you working for

13 them, Inmate Daily Labor Program, since 1995

14 with just a short break in, I think it was '05

15 where you were in culinary for very short time.

16         INMATE JONES:  Yeah.

17         DEPUTY COMMISSIONER BLONIEN:  And they

18 found a way to get you back.  So your skills in

19 carpentry, painting.  I hear you even have

20 skills in plumbing.

21         INMATE JONES:  Yes, that's where we're

22 currently working on right now.

23         DEPUTY COMMISSIONER BLONIEN:  What are

24 you doing?

25         INMATE JONES:  We're changing all the

26 toilets over at North Facility, in all the

27 cells.

1        **DEPUTY COMMISSIONER BLONIEN:** That's a

2    big job.

3        **INMATE JONES:** Yeah it's like 1500 of

4    them.  I think we've done 100 of them so far.

5        **DEPUTY COMMISSIONER BLONIEN:** Are you

6    putting stainless steel ones in.

7        **INMATE JONES:** Stainless steel. And it's

8    all new fixtures on the inside and all new pipe

9    work in the chases.

10        **DEPUTY COMMISSIONER BLONIEN:** And how

11    many of you are working on that?

12        **INMATE JONES:** It's a crew of ten.

13        **DEPUTY COMMISSIONER BLONIEN:** That will

14    take you a while.

15        **INMATE JONES:** Yeah.

16        **DEPUTY COMMISSIONER BLONIEN:** Your

17    chronos say, I looked through your C File and

18    there's several chronos about your work.  But I

19    thought that this one pretty much typified what

20    your supervisors think about you.

21        "Inmate Jones was initially

22            assigned to the program as a

23            carpenter.  However he's been

24            involved in several other projects

25            that require knowledge in

26            plumbing, electrical work and

27            basic constructions.  Jones

1       consistently demonstrates his
2       skill and knowledge on a daily
3       basis and is always ready to lend
4       a hand either in a leadership role
5       or to simply assist in the task at
6       hand.  The strong perseverance,
7       quality of work and the care and
8       use of state equipment has earned
9       him great respect with fellow
10      inmates and staff alike.  Jones
11      has also been trained in lead
12      abatement.  I find inmate Jones's
13      work performance and conduct on
14      the job to be above average.  He
15      has proven himself to be a great
16      asset to the IDL Inmate Day Labor
17      Program and is highly recommended
18      for retention in the future."
19 And that's by Correctional Officer Hardy, H-A-R-
20 D-Y who at that time was head of the Inmate Day
21 Labor Program.  And with the new systems in
22 Corrections it's hard to keep a worker --
23         INMATE JONES:  (Coughing) Excuse me.
24         DEPUTY COMMISSIONER BLONIEN:  -- for more
25 than two years.
26         INMATE JONES:  Yeah.
27         DEPUTY COMMISSIONER BLONIEN:  Because

32

1  there's not as many jobs as there are inmates.

2  So we like to rotate them around. So it speaks

3  highly of your qualifications that they continue

4  to write overrides and keep you in the program.

5  In terms of educational accomplishments, you got

6  your GED in 1991. And then you've been

7  currently taking college courses through

8  Coastline College. How much does each course

9  cost?

10      **INMATE JONES:** It's, I'm pretty sure it's

11  like $28 a unit and each class is three units.

12  And it's, then you pay for the books. And those

13  vary from 50 to 100 dollars per book.

14      **DEPUTY COMMISSIONER BLONIEN:** Does your

15  family help you?

16      **INMATE JONES:** Yeah.

17      **DEPUTY COMMISSIONER BLONIEN:** That's very

18  nice of them.

19      **INMATE JONES:** Yeah.

20      **DEPUTY COMMISSIONER BLONIEN:** So far

21  you've completed and you're paying it back, it's

22  paying off. You've taken history, psychology,

23  biology, geology, US history, Introduction into

24  Communication, sociology, Succeeding in College,

25  Cinema History, health, American Government,

26  Personal Finance, Marine Science and Child

27  Development. And in all those courses you have

33

1    four B's, and all the rest are A's.  Just

2    excellent.

3         INMATE JONES:  Thank you.

4         DEPUTY COMMISSIONER BLONIEN:  I wish my

5    son brought that home.  In terms of therapy and

6    self-help I went back, you were in AA since '95.

7    The chrono I could find I saw something that

8    said you'd been in since '91.  But whatever,

9    you've been in a long time.  And have you worked

10   through the steps?

11        INMATE JONES:  Oh yeah.

12        DEPUTY COMMISSIONER BLONIEN:  And do you

13   know them all?

14        INMATE JONES:  Yes.

15        DEPUTY COMMISSIONER BLONIEN:  And how do

16   they help you?

17        INMATE JONES:  Well I use them.  You

18   know, maybe not strictly to the way that to the

19   letter that what they say.  But I use them in my

20   daily life.  And I know that they will always be

21   a part of my life because of my history and my

22   actions.  And, you know, I was just discussing

23   this earlier of how they've helped me just deal

24   with people on a regular basis in this

25   environment that I'm living in now.  You know to

26   cope with problems.

27        DEPUTY COMMISSIONER BLONIEN:  Give me an

34

1    example.

2         INMATE JONES:  Oh well, you know, maybe

3    in the past I wouldn't have been able to if

4    someone would come to me and ask me for help and

5    I may have not of wanted to give them help.  But

6    now that I know I need to be of service and

7    maybe help somebody else that I can.  Like I try

8    to, I've made lists of all the people that I

9    have harmed because of my actions.  And

10   although, like step nine, I'm, should, they want

11   you to make direct amends to the people that

12   I've harmed.  And that's the hardest step that I

13   do have because there's no way I can make direct

14   amends to Tom himself, obviously, but to his

15   family either.  I've had contact with some

16   family friends of his and they've told me that I

17   shouldn't contact his mother because it would

18   just bring her more grief.  That's what their

19   feeling was.

20        DEPUTY COMMISSIONER BLONIEN:  No there's

21   sort of a formal process for that.  You can

22   write a letter.

23        INMATE JONES:  Right, right.

24        DEPUTY COMMISSIONER BLONIEN:  And then

25   you submit it to the district attorney.  And

26   then the district attorney asks if they want it

27   or not.  And you may, you wouldn't even know

1  whether they accepted it or not.

2       INMATE JONES:  Right and I don't want to

3  cause Betty or Tom or Robert any more harm than

4  I already have.

5       DEPUTY COMMISSIONER BLONIEN:  You knew

6  them?

7       INMATE JONES:  Yeah, I worked with Tom's

8  brother Robert.  And I never really met his

9  mother.  I talked to her a few times on the

10 phone but --

11      DEPUTY COMMISSIONER BLONIEN:  She lived

12 in Florida, right?

13      INMATE JONES:  I don't know if she lived

14 in Florida or she lived up north.  She might

15 have been up north, I'm not sure.

16      DEPUTY COMMISSIONER BLONIEN:  You've

17 taken classes in anger management, reading

18 programs, self-esteem for lifers groups.  Did

19 you get in that or you're just on the waiting

20 list.

21      INMATE JONES:  No, I have a --

22      DEPUTY COMMISSIONER BLONIEN:  I have a

23 chrono that you're on the waiting list.

24      INMATE JONES:  Yeah, I just had the

25 waiting list.

26      DEPUTY COMMISSIONER BLONIEN:  But it was

27 on the, on your resume.  I hadn't seen where you

1  had completed it.  That's a great group.

2        INMATE JONES:  Yeah.

3        DEPUTY COMMISSIONER BLONIEN:  And it's

4  hard to get into.  What's Legal Services for

5  Prisoners with Children?

6        INMATE JONES:  It was a group of lawyers

7  that came in and they wanted to show prisoners

8  with children, how you could, you know, help

9  yourself to getting -- you know, depending on

10 your circumstance.  If you didn't have contact

11 with your children how you could go about that.

12 What kind of rights you had, I guess, as a

13 prisoner.

14        DEPUTY COMMISSIONER BLONIEN:  Do you have

15 children?

16        INMATE JONES:  No I don't.  I took it

17 because there was also another aspect of just

18 some, of resources that they were going to

19 provide everybody.  But that's just the official

20 name of the group.

21        DEPUTY COMMISSIONER BLONIEN:  You

22 participated in the teddy bear drive, which is a

23 great program here.

24        INMATE JONES:  Yeah.

25        DEPUTY COMMISSIONER BLONIEN:  You did

26 Dr. Gordon's Family Effectiveness Training,

27 numerous anger management workshops.  You

1   completed the IMPACT program.  And you've done

2   -- You've done over 100 educational video

3   reports.  I saw the chrono.  And those are on

4   all different topics.

5           INMATE JONES:  Yeah.

6           DEPUTY COMMISSIONER BLONIEN:

7   Participated in peer education with the sexual

8   transmitted diseases, self-help, life skills

9   program, the children's holiday festival from

10  '01 to '04.  Did they not do it this year?

11          INMATE JONES:  Yeah, they did it.  Yeah,

12  they said it was the best one ever.

13          DEPUTY COMMISSIONER BLONIEN:  And

14  entrepreneurship, business principles.  So

15  you've done a lot in terms of keeping yourself

16  busy, both by working and by improving yourself

17  by using self-help.  So I'm sure your college

18  courses keep you pretty busy.

19          INMATE JONES:  Yeah.

20          DEPUTY COMMISSIONER BLONIEN:  In your

21  free time, correct?

22          INMATE JONES:  Every day I have to study.

23          DEPUTY COMMISSIONER BLONIEN:  And it

24  probably doesn't give you a chance to do any

25  independent self-help other than that at the

26  moment.  Are you reading anything in addition to

27  your college courses?

38

1          **INMATE JONES:**  I try to read novels but I

2   really haven't had the time because of my

3   studies.  You know, I pick up the newspaper or a

4   magazine and peruse that or any kind of self-

5   help books.  I like reading those just in-

6   between to break up the monotony of just

7   studying.

8          **DEPUTY COMMISSIONER BLONIEN:**  And do you

9   study the law?

10          **INMATE JONES:**  No, that's one area I

11  don't do.  I don't have a knack for it.  It's

12  kind of confusing, a lot of it.  I've been to

13  the law library and I've looked at it before to

14  help myself out with my appeals or whatever.

15          **DEPUTY COMMISSIONER BLONIEN:**  Anything

16  else that you've been doing that we haven't

17  discussed?

18          **INMATE JONES:**  Just another anger

19  management class that I'm currently enrolled in.

20  I mean, there wouldn't be any paperwork on that

21  because I'm currently in it.

22          **DEPUTY COMMISSIONER BLONIEN:**  The last

23  panel in '04 asked for a psych report that dealt

24  with assessing your violence potential in the

25  community.  Whether you've explored your

26  commitment offense, the need for further self-

27  help, whether or not you did have a blackout at

39

1    the time of the commitment offense and have you

2    come to terms with the commitment offense.   And

3    Dr. Macomber had a long interview with you and

4    talked about the different aspects of the

5    questions.   And he noted in terms of your

6    assessment of dangerousness that your excellent

7    work ethic, total sobriety, a good understanding

8    of the dangerousness of any use of alcohol and

9    you have good judgment.   In comparison to the

10   average inmate population your potential for

11   dangerousness is below average.   And considering

12   for potential of dangerous behavior if released

13   on parole to the community he administered the

14   Level of Service Inventory Revised and notes

15   that it's an actuarial measurement that assesses

16   criminal history, substance abuse history,

17   vocational achievement, current adjustment as

18   well as other factors to determine your risk

19   level.   And your score was 4.2, which means that

20   if 100 men were released to parole you would do

21   better than 95 of them.   And as a result he

22   referred back to Dr. Sexton's (phonetic) psych

23   report from '05 and stated that he does not pose

24   a risk to society any greater than the average

25   citizen.   With the caveat that alcohol

26   dependence was definitely a risk factor in the

27   commitment offense.   If Mr. Jones ever went back

40

1   to drinking his risk level would increase.
2   However, at this point in his life it appears to
3   have very low probability.  And one of the
4   evidentiary items is that you haven't ever had a
5   disciplinary or a dirty test or a 115 while in
6   prison with anything to do with alcohol or drugs
7   or stimulants.  And Dr. Macomber noted, and we
8   all know, that there is alcohol available in the
9   institution.  That those who choose to drink it
10  or make it, that it is there.  In terms of
11  exploring your commitment offense, how do you do
12  that when you don't remember it?
13      **INMATE JONES:**  That's a good question,
14  you know.  All I can do is discuss aspects that
15  I think may have happened to me.  You know, what
16  led up to these things.  I've discussed them
17  with the psychs like that and tried to cope with
18  it and discuss it in my therapy groups and, you
19  know, in my AA program.  You know, that's about
20  all I can say.
21      **DEPUTY COMMISSIONER BLONIEN:**  The person
22  that you were that committed this offense and
23  killed one of your good friends.  How did all
24  that anger get in you that you could take the
25  life of a friend?
26      **INMATE JONES:**  That's a good question.
27  You know, I've tried to address that to myself

1    many a times.  I just don't know how, you know,

2    what set me off to do that.  All I can say is

3    that maybe the -- I'm not blaming the alcohol

4    but I know it was a big factor.  That maybe it,

5    you know, loosened up my inhibitions to be able

6    to do something like that.  Not that I'm saying

7    that it's right or, you know, that that's what

8    the cause was.  I just didn't have the coping

9    mechanisms back -- that I have now to be able to

10   deal with, you know, frustrations or anger.  And

11   being able to address issues that was, whatever

12   the issue that caused me to do what I did, you

13   know.

14        **DEPUTY COMMISSIONER BLONIEN:**  When you

15   read about that person who was in the back of

16   the police car raging and even commending

17   himself for doing the shooting.  I mean, you're

18   the only person here who knew that person.  We

19   don't know what you were like.  Would you have

20   ever guessed that you were on the road to this

21   vicious crime?

22        **INMATE JONES:**  No, no.  I mean, I

23   probably could tell you that I knew I had a

24   problem with drinking but never with that level

25   of anger.

26        **DEPUTY COMMISSIONER BLONIEN:**  Did you

27   know you had a problem with your roommate?  Had

42

1    you had other problems with him?

2            INMATE JONES:  Nothing more than, you

3    know, just the typical disagreements over, you

4    know.

5            DEPUTY COMMISSIONER BLONIEN:  He didn't

6    steal your girlfriend or anything like that?

7            INMATE JONES:  No.

8            DEPUTY COMMISSIONER BLONIEN:  No?

9            INMATE JONES:  No.  He didn't like my

10   girlfriend but, you know.

11           DEPUTY COMMISSIONER BLONIEN:  And you

12   didn't work with him.

13           INMATE JONES:  No.

14           DEPUTY COMMISSIONER BLONIEN:  And this is

15   just a situation where there were three

16   independent roommates in an apartment.  You

17   weren't high school friends or anything like

18   that?

19           INMATE JONES:  No.

20           DEPUTY COMMISSIONER BLONIEN:  But you had

21   been living there a long time.

22           INMATE JONES:  Yeah, I lived with him for

23   a couple of years.

24           DEPUTY COMMISSIONER BLONIEN:  And, you

25   know, exploring whether you had a blackout or

26   not.  I mean, all they can do is ask you and you

27   don't, you don't remember.

43

1          **INMATE JONES:**  I don't remember that

2    particular instance but I could tell you it

3    wasn't the first time that I ever had a

4    blackout.  I mean, I could always -- I mean --

5          **DEPUTY COMMISSIONER BLONIEN:**  Let me turn

6    the tape.

7              (The tape was turned over.)

8          **DEPUTY COMMISSIONER BLONIEN:**  Okay, we're

9    back on tape and we're talking about blackouts.

10    What is a blackout?

11         **INMATE JONES:**  A temporary loss of

12    recollections of your actions, you know.  I

13    imagine it could be losing consciousness also

14    but that's not what I did.

15         **DEPUTY COMMISSIONER BLONIEN:**  You said

16    temporary.

17         **INMATE JONES:**  Yeah.

18         **DEPUTY COMMISSIONER BLONIEN:**  So do you

19    get back that memory?

20         **INMATE JONES:**  Well, I mean temporary as

21    in that moment.  You don't remember that moment.

22         **DEPUTY COMMISSIONER BLONIEN:**  Okay.

23         **INMATE JONES:**  Not that you totally lose

24    your memory.  Because I've had other instances

25    of the exact same thing.  People would come up

26    to me in the morning and go, you know you did

27    this last night and you did that and I'd have no

44

1    recollection of it.

2         DEPUTY COMMISSIONER BLONIEN:    And your

3    statements.  The doctor talks about he

4    questioned you.  You had a visitor in jail and

5    you told the visitor that you remembered the

6    shooting but that you told the doctor you were

7    lying to the visitor.  Why would you do that?

8    Why wouldn't you say right away, I don't

9    remember?

10        INMATE JONES:    I'm not clear on what

11    you're asking me.

12        DEPUTY COMMISSIONER BLONIEN:    You had a

13    visitor in jail.  The doctor talked to you about

14    a visitor that you had had in jail.

15        INMATE JONES:    Yes.

16        DEPUTY COMMISSIONER BLONIEN:    And you had

17    told the visitor that you had shot and recounted

18    what happened.

19        INMATE JONES:    Why would I tell the

20    visitor that?

21        DEPUTY COMMISSIONER BLONIEN:    Yeah.

22        INMATE JONES:    The only thing that I've

23    come up with is it's just a way of coping with

24    what I had done, you know.  I was still probably

25    angry.  I had realized what had happened, you

26    know.  The grave nature of what was going on.

27        DEPUTY COMMISSIONER BLONIEN:    And what

1    was going to happen to you.

2          **INMATE JONES:**  Exactly.  And maybe that

3    was a way of coping with and dealing with and

4    realizing what I had done, you know.  Taking the

5    life of my friend.

6          **DEPUTY COMMISSIONER BLONIEN:**  And you go

7    on to say that -- The doctor says that you do

8    accept total responsibility though.  Claiming

9    that you were the only one who could have shot

10   him and that he was, that you were to accept

11   responsibility for this offense along with the

12   consequences.  Did you have a jury trial?

13         **INMATE JONES:**  Yes.

14         **DEPUTY COMMISSIONER BLONIEN:**  A jury

15   trial?

16         **INMATE JONES:**  A jury trial.

17         **DEPUTY COMMISSIONER BLONIEN:**  And then he

18   talks about:

19             "Regarding the question of whether

20             Mr. Jones will drink alcohol in

21             the future.  He stated that his

22             alcoholism resulted in his actions

23             in which he shot and killed his

24             roommate.  As a result he has

25             developed deep-seated antipathy

26             and revulsion toward alcohol.  He

27             noted that alcohol is very much

1         available in the institution.   If

2         he wanted to drink he said he had

3         access to it.   The fact that he

4         has remained clean and sober now

5         for 17 years is evidence of his

6         maturity, self-control and

7         determination to remain clean and

8         sober.   Mr. Jones continues to

9         attend AA on a regular basis and

10        he stated that this is going to be

11        a lifelong activity for him, even

12        when released on parole."

13   So with that I am going to return it back to the

14   Chair.

15        **PRESIDING COMMISSIONER GARNER:**   Any

16   contact with your family?

17        **INMATE JONES:**   Oh yeah.

18        **PRESIDING COMMISSIONER GARNER:**   Visits?

19        **INMATE JONES:**   Yes.

20        **PRESIDING COMMISSIONER GARNER:**   Who do

21   you get visits from?

22        **INMATE JONES:**   I haven't had one in a

23   while because my mother lives in Arizona and my

24   father and brother live way down south.   So I

25   haven't had one from them for awhile.   But my

26   mother and my cousin Tammy are the ones that

27   have been visiting me.   And my uncle, uncle Don.

47

1          **PRESIDING COMMISSIONER GARNER:**  Letters?
2   Who are you in contact with?
3          **INMATE JONES:**  Yeah, I write them all the
4   time.
5          **PRESIDING COMMISSIONER GARNER:**  Phone
6   calls?
7          **INMATE JONES:**  Yeah.
8          **PRESIDING COMMISSIONER GARNER:**  You were
9   involved in the trades at the time of this
10  commitment offense.  What happened to your
11  tools?
12         **INMATE JONES:**  As far as I know my
13  employer, he just kept them.
14         **PRESIDING COMMISSIONER GARNER:**  Okay.  So
15  you don't have tools that any family member kept
16  for you?
17         **INMATE JONES:**  No.
18         **PRESIDING COMMISSIONER GARNER:**  Have you
19  ever been offered any inmate-manufactured
20  alcohol while here?
21         **INMATE JONES:**  Yeah, sure.
22         **PRESIDING COMMISSIONER GARNER:**  So you
23  know it's available.
24         **INMATE JONES:**  Oh yeah.
25         **PRESIDING COMMISSIONER GARNER:**  Did you
26  have any trouble declining?
27         **INMATE JONES:**  No, no, none whatsoever.

48

1. Most people know that I don't want it and so --
2  It may have been a long time ago that they
3  offered it to me but I just don't associate with
4  anybody that drinks that.  I mean, you could
5  smell it but I have no desire ever to drink
6  again.  I mean, if taking the life of my friend
7  doesn't tell me that I need to not drink.  If
8  that doesn't teach me a lesson I don't know what
9  will.

10        **PRESIDING COMMISSIONER GARNER:**  Okay,
11. thank you.  Any follow-up questions?

12        **DEPUTY COMMISSIONER BLONIEN:**  You said
13  you were coming back from a tool convention.
14  Then I thought you were fired from your job and
15  that was one of the reasons you were distraught.
16  How does that fit in?

17        **INMATE JONES:**  Well, that's one of the
18  things that I've learned since then is that the
19  boss told me not, not that I was fired but to
20  take some time off.  Because I guess I was so
21  agitated at work because of events leading up
22  to --

23        **DEPUTY COMMISSIONER BLONIEN:**  So you were
24  agitated because of your girlfriend.  Now if you
25  go out you could get another girlfriend and they
26  could still agitate you.  How would you cope?

27        **INMATE JONES:**  Well, I have learned

1  coping mechanisms now to be able to deal with

2  and discuss problems that may arise and not let

3  my anger or my emotions run wild.

4        **DEPUTY COMMISSIONER BLONIEN:**  That's all

5  I have.

6        **PRESIDING COMMISSIONER GARNER:**  Okay.

7  Ms. Tardiff, any questions?

8        **ATTORNEY TARDIFF:**  No.

9        **PRESIDING COMMISSIONER GARNER:**  You want

10  to go ahead and close then?

11        **ATTORNEY TARDIFF:**  Thanks.  In terms of

12  Mr. Jones' pre-incarceration history, for the

13  most part I believe it is favorable and

14  supportive of a release.  I know he didn't

15  graduate from high school and he came from

16  probably a dysfunctional family, divorce,

17  alcoholism.  But his work skills and his work

18  history were very stable.  Which I think shows a

19  lot because we see a lot of inmates in here that

20  some have never even worked prior to

21  incarceration.  So he had a stable work history.

22  And his criminal history was insignificant,

23  alcohol-related only.  Which not to minimize it,

24  but there was no violence in his background.

25  And to add on to that there has been no violence

26  since the time of the commitment offense either.

27  In terms of what he's done since he's been

50

1    incarcerated I think that we all can agree he's
2    done a great job.  And I'm not going to belabor
3    what's already been gone into but we know he's
4    got a GED, excellent college grades.  A lot of
5    self-help, a lot of AA, 12 steps, knows his
6    steps, works his steps.  A lot of reading of
7    self-help books.  Anger management, his work
8    skills are admirable.  Laudatory chronos, which
9    shows that he's a very good and well thought of
10   worker.  A lot of that has already been gone
11   into and the fact that he's been IDL since '95,
12   which shows the value of his work skills.  He
13   has never received a 115.  We all know that's
14   remarkable.  He's only had two 128s, the last
15   one was in '92.  So his post-incarceration
16   history is obviously supportive of a release
17   date.  His parole plans, contrary to the
18   district attorney's letter, are viable and
19   supportive of release.  He's sought out the AA
20   meetings, where they'll be, asked for a sponsor.
21   A lot of support there.  He's got a letter from
22   his cousin, Tammy, which is extremely supportive
23   of him.  Gives him a job as well as housing.
24   Goes into her Christianity and the fact of
25   inspiring letters she's received from him.
26   Proud of the changes I have seen in Mike over
27   the years, he has grown so much.  How his

51

1    thought processes have progressed in such a

2    positive manner over the years.  Introduction to

3    Religion from someone I believe -- I know he has

4    been introduced to religion from someone, I

5    believe, in prison.  I don't know if it's just

6    this or if it has been his schooling.  Or just

7    an overall giving up of the quote, old man, end

8    quote and letting the quote, new man, end quote,

9    take hold.  The district attorney's letter, I

10   really wish the district attorney would attend

11   these hearings, particularly in this case.

12   Because some of the things I think they would

13   learn at the hearing.  Particularly they make

14   light of his work skills and they're probably

15   not aware of the IDL and the long-term

16   employment.  They address the psych eval and it

17   says that the resulting report is poorly

18   reasoned and defies common sense, and I'll go

19   into that in a minute.  Then they say he has no

20   firm offers of employment.  Well he does.  It

21   says, his success on parole will be determined

22   in large part by a comprehensive, long-term plan

23   which includes a vocation and a support system.

24   Well he has a vocation, he's got a very good

25   vocation, and he has a support system.  And then

26   it goes on to state, it does not appear that the

27   inmate has made an effort to secure either of

52

1  these safeguards.  So I don't, you know, it's
2  ludicrous their opposition.  His psych evals
3  have been positive and supportive of release
4  since, well I went back ten years.  1996 he's
5  had very good psych evals.  His most recent
6  states that he has deep feelings of remorse at
7  the death, at the victim's death at his hand.
8  He accepts total responsibility.  His feelings
9  of remorse appear to be sincere.  And then going
10  into whether or not long-term use, the alcohol
11  use.  What effect that probably had on his
12  memory, an extensive history of severe
13  alcoholism.  This extensive use of alcohol does
14  cause brain damage and loss of cognitive
15  abilities.  A person with an extensive history
16  of alcohol use can learn to walk, talk and
17  function in a way that appears normal, though
18  he's quite intoxicated.  And that's I think
19  addressing the way he was acting on the night of
20  the commitment offense and riding the bicycle as
21  if he wasn't intoxicated.  I think we all know,
22  have known people here in our lives that they go
23  out and they drive drunk all the time and they
24  never get busted because they're always driving
25  drunk.  And I think that's in essence what this
26  is saying.  Is you get so used to functioning
27  while being intoxicated that you appear like

53

1    you're not.  And then it goes on to say, this

2    might explain why he was able to ride a bicycle

3    even while intoxicated.   The expert -- They

4    testified at his trial that his level of alcohol

5    substantially, the amount he had would

6    substantially impair someone's judgment,

7    perceptions and the ability to control impulses

8    and emotions.  And it concludes that, in this

9    writer's opinion due to the history of alcoholic

10   blackouts, due to the history of extreme alcohol

11   dependency, also due to the extreme emotional

12   state associated with the fistfight and the

13   argument with the inmate, it is very possible

14   that he does not remember the details of this

15   offense.   It goes into the risk factors.   That

16   the risk factor obviously is the return to the

17   use of alcohol.   That he has developed a deep-

18   seated anti-, I'm not sure what the, -pathy

19   (antipathy) and revulsion towards alcohol.  And

20   then they go into the fact he hasn't had any

21   115s.   He's been clean and sober for 17 years,

22   gone to AA on a regular basis.   And it concludes

23   that based on his excellent work ethic, total

24   sobriety, a good understanding of the

25   dangerousness of any use of alcohol and he has

26   good judgment that his potential if released

27   into the community is very low.  And that the

54

 1  alcohol dependency appears to be a very low
 2  probability in terms of a risk factor.  He has
 3  made excellent use of his institutional time.
 4  Several valid and current job offers and good
 5  family support.  He has changed over his years
 6  of incarceration.  He no longer is the
 7  irresponsible, immature, drunken individual that
 8  he was at the time of the commitment offense.  I
 9  believe he would maintain these gains when he is
10  released on parole.  The prognosis for success,
11  for adjustment to the community is excellent.
12  In '05 he also had a psych eval and that was
13  done by Dr. Marek, M-A-R-E-K.  It states, due to
14  his substantial AA programming he is a much
15  lower risk for returning to drugs or alcohol.
16  He is also unlikely to ever again commit any
17  violent, irrational acts.  And then in '03, the
18  one that's referred to in his most current psych
19  eval, states under diagnostic impressions, his
20  alcohol abuse is in full remission.  He had a
21  high GAF score of 90.  He indicated how
22  remorseful he was for the death of his friend.
23  His level of dangerousness is average compared
24  to the general community population.  That the
25  risk factor would be the use of alcohol and this
26  a appears to be a low probability at this time.
27  In '99 he also received a favorable psych eval.

55

```
 1   It states he should have a very good prognosis
 2   for living in the community.  His insight and
 3   judgment appear to be much better now than when
 4   he was using drugs.  His crime was, of course, a
 5   direct result of his inebriated condition.  He
 6   has a very good record with the CDC and it is
 7   expected he will continue.  He seems determined
 8   never to drink again.  He does not seem to be at
 9   this time a significant risk for violence
10   against anyone.  He is intelligent, rational and
11   seems ready to take his place as a responsible
12   citizen in society.  And Dr. Bakeman, B-A-K-E-M-
13   A-N, who wrote the '99 eval states, I have known
14   inmate Jones for several years.  He is an
15   intelligent and thoughtful individual who seems
16   intent on improving himself in a number of
17   different ways.  He has a low potential for
18   returning to a life of violence, drinking or
19   disorderly conduct.  I recommend that the Board
20   of Prison Terms seriously consider him for a
21   parole date because he seems ready to become a
22   responsible citizen.  And then all the way back
23   to '96.  He should be able to maintain the gains
24   he has made.  If he's considered for parole his
25   level of dangerousness is likely to be less now
26   than the average inmate.  I definitely think
27   that Mr. Jones is ready to be released.  That
```

56

1  he's done everything he can do to make himself

2  ready, to make him not a danger to society.  I

3  think this is truly one of those crimes where

4  the alcohol abuse was the precipitating factor

5  of the crime and also his inability to deal with

6  his anger.  He's taken anger management.  He's

7  learned how to cope with life today through the

8  skills he's learned.  And I submit at this time

9  that Mr. Jones is in fact suitable for parole.

10  Also there was one other letter here from the

11  Buddhist Meditation Studies that, regarding his

12  commitment to that program as an additional way

13  of helping him deal with stress and coping and

14  self-help.  Thank you.

15      **PRESIDING COMMISSIONER GARNER:**  All

16  right, thank you.  Mr. Jones, this is your

17  opportunity if you'd like to address the panel

18  as to why you think you're suitable for parole.

19      **INMATE JONES:**  Okay, thank you, yes.  I

20  think I'd appreciate it very much if you would

21  find me suitable today.  I know you have

22  concerns over my drinking and I would just like

23  to put your minds at rest to that.  That will

24  never happen again, you know.  I know that's a

25  major concern and I take responsibility for

26  that.  I can only hope that you see that I have

27  made the efforts.  I know that it's more readily

57

```
 1   available out on streets than it is in here but
 2   I think I've demonstrated that, you know, I
 3   haven't done the things that, you know, someone
 4   that would drink in here and it would carry over
 5   to there.  I just don't know how to stress that
 6   enough, that AA will definitely be a big part of
 7   my life, whether I'm in here or out on the
 8   streets.  I'd like you to know that I no longer
 9   pose a threat to this community.  I would
10   definitely like to have an opportunity to prove
11   that to this good panel here, the people of the
12   community and to Tom's family, my own included.
13   To show that I'm a different man, that I'm not
14   the man that I was in 1989.  That I have now
15   learned many ways to deal with problems.  To
16   discuss them, to cope with stress in a peaceful
17   manner now and not, you know, let the anger or
18   my emotions get the better of me.  And I know
19   that the alcohol, without the alcohol it's a way
20   better situation.  I'd just like to get the
21   chance once again to be a productive member of
22   the community.  And I'd like you to know I'm
23   very sorry for wasting everybody's time here
24   today.  And sorry mainly, especially to Tom
25   because what I did was wrong.  And I know I
26   can't bring him back but I'd give anything to,
27   you know, show Tom that I am a different man.
```

58

1    That I'm not the same guy that he knew.  That's

2    it, thank you.

3         **PRESIDING COMMISSIONER GARNER:**  Thank

4    you.  It's now 2:45 p.m. and we will recess for

5    deliberations.

6         **INMATE JONES:**  Okay.

7                    **R E C E S S**

8                    --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

59

```
1         CALIFORNIA BOARD OF PAROLE HEARINGS
2                  D E C I S I O N
3         DEPUTY COMMISSIONER BLONIEN:  We are back
4    on record.
5         PRESIDING COMMISSIONER GARNER:  All
6    right, it is now 3:14 p.m. in the matter of
7    Michael Jones, CDC E Edward 40401.  Mr. Jones,
8    the panel has reviewed all the information
9    received from the public and relied on the
10   following circumstances in concluding that you
11   are suitable for parole and would not pose an
12   unreasonable risk of danger to society or a
13   threat to public safety if you were released
14   from prison.  So --
15        INMATE JONES:  Thank you, thank you,
16   thank you very much, thank you.
17        PRESIDING COMMISSIONER GARNER:  Okay,
18   listen up, this is -- You're just starting on a
19   new path.
20        INMATE JONES:  Thank you.
21        PRESIDING COMMISSIONER GARNER:  What
22   we're going to do is try to get a record that
23   will stand some scrutiny because lots of people
24   are going to be looking at this.
25        INMATE JONES:  Yes sir.
26        PRESIDING COMMISSIONER GARNER:  Okay, the
27   MICHAEL JONES E-40401  DECISION PAGE 1  05/01/06
```

60

1   panel also noted that you had no juvenile record
2   of assaulting others.  In fact, you had no
3   juvenile record at all.  That other than the
4   issue of alcohol you did have a stable social
5   history.  You were gainfully employed and
6   working.  Unfortunately the alcohol was the
7   instability in your life.  You basically -- The
8   panel concluded you were a functioning
9   alcoholic.  But while you have been in prison
10  you have enhanced your ability to function
11  within the law upon release through
12  participation in educational programs.  You
13  completed your GED, you're attending Coastline
14  College.  As Commissioner Blonien noted you're
15  getting A's in the classes.  That so far as your
16  self-help program, she is able to identify that
17  you have been an active member of AA since '95.
18  There's indications going back to '91 but we're
19  going to use '95 since we can determine that and
20  verify it.  You have also done three anger
21  management courses, you have participated in the
22  IMPACT program.  And also for the record we did
23  read the letter that was prepared by Hugh
24  Macmillan, M-A-C-M-I-L-L-A-N, the coordinating
25  teacher for Buddhist Meditation Studies at CTF
26  and this is dated 2007 (sic), a very favorable
27  **MICHAEL JONES E-40401   DECISION PAGE 2   05/01/06**

1    letter with respect to your participation in the
2    Buddhist Meditation Studies.  So far as your
3    vocational programs you have completed silk
4    screening.  But I think more importantly your
5    institutional job assignments that you've been
6    on, the Inmate Day Labor program since 1995 and
7    have gained some significant experience.  I
8    think on the record you had indicated that
9    you're in the process of remodeling a rather
10   extensive number of bathrooms in one of the
11   units here.  The panel noted that the offense
12   was committed as a result of some significant
13   stress in your life at the time.  And it was the
14   intense use of alcohol, to the point where, as
15   indicated in a couple of the psychologists'
16   reports, that the issue of blackouts was not an
17   unexpected consequence of the degree of alcohol
18   consumption that you were involved in.  And
19   because of your maturation, growth, greater
20   understanding and your advanced age it's reduced
21   the probability of recidivism.  The panel noted
22   you do have realistic parole plans, which
23   include a job offer and family support.  You
24   have a cousin that's offering housing support
25   and a job.  Also you do have backup plans that
26   are offering the same thing.  You've maintained
27   **MICHAEL JONES E-40401  DECISION PAGE 3  05/01/06**

1    close family ties while in prison via letters,

2    visits and phone calls.  You had indicated

3    visits from your uncle, your mother, your

4    cousin, letters and phone calls with them being

5    the most likely people to stay in contact with.

6    That you have maintained positive institutional

7    behavior, which indicates a significant

8    improvement in your control.  That you have had

9    no 115s during your entire period of

10   incarceration.  You have only had two 128s, the

11   last in 1992, and neither of those were

12   associated with anything other than behavior.  I

13   think the last was a failure to follow an order

14   or something such as that.  And I particularly

15   note the panel did note that you've had no

16   indication of any substance abuse while

17   incarcerated and the panel noted that it's

18   available if you wanted it, particularly the

19   pruno.  But you have shown signs of remorse.

20   You've indicated that you understand the nature

21   and magnitude of the offense, you've accepted

22   the responsibility for your criminal behavior

23   and you have a desire to change toward good

24   citizenship.  These have been evidenced in

25   numerous psychological reports, counselors

26   reports, and also, for the record, the panel did

27   **MICHAEL JONES E-40401   DECISION PAGE 4   05/01/06**

63

1    read the letter of remorse that you prepared.

2    So far as your psychological report the panel

3    noted that the most recent report, which was

4    prepared by Dr. Macomber, which was dictated on

5    January 14, 2006 so it's a very, very recent

6    report, is favorable.  Particularly that the

7    doctor noted that you have an excellent work

8    ethic, total sobriety, a good understanding of

9    the dangerousness of using alcohol and good

10   judgment.  Also that you don't pose a risk to

11   society any greater than the average citizen.

12   And also that alcohol dependence was definitely

13   a significant risk factor in the committed

14   offense and if you went back to drinking your

15   risk level would increase.  However, at this

16   point in your life this appears to have a very

17   low probability.  And also that you are no

18   longer the irresponsible and immature, drunken

19   individual that you were at the time of the

20   commitment offense.  And that you're likely to

21   maintain the gains that you have achieved when

22   released on parole and your prognosis for

23   success or adjustment to the community is

24   excellent.  For the record, the panel also noted

25   but did not consider the report that was

26   prepared on October of 2005 by Dr. Marek.  And

27   **MICHAEL JONES E-40401  DECISION PAGE 5  05/01/06**

64

1    there were two particular reasons.  That there

2    were some significant gaps.  It's almost as if

3    the report in some areas is incomplete, words

4    are missing.  And of particular note is that the

5    report was neither signed by Dr. Marek or his

6    supervisor, Dr. Zika.  So we wanted that in the

7    record.  We also want to put on the record that

8    we did consider the letter from the District

9    Attorney's Office and unfortunately the letter

10   is not reflective of some current information

11   with respect to your programming and some of

12   your parole plans.  The panel determined that

13   the base term of your confinement is as follows.

14   The base line offense of which the prisoner is

15   convicted is murder in the second degree with

16   the use of a firearm, Penal Code Section 187.

17   The offense occurred on May 20, 1989.  The term

18   is derived from the matrix located in Title 15

19   and we chose 2403(c).  It was a second-degree

20   murder, it was for an offense committed on or

21   after November 8, 1978, and the panel finds that

22   category 2-B is appropriate in that there was a

23   prior relationship between you and the victim

24   and it appears that death was almost immediate.

25   And for that the panel assesses 216 months for

26   the base offense and notes that this is middle

27   **MICHAEL JONES E-40401  DECISION PAGE 6  05/01/06**

1   term.  So far as the total term calculations.

2   The base term was 216 months.  The adjustment

3   for the use of the weapon was six months,

4   bringing us to a total of 222 months.  So far as

5   post-conviction credits.  The post-conviction

6   credits were started on the date that the life

7   term, which was September 2, 1990, to today's

8   date which is May 1, 2006.  Essentially 15-and-

9   a-half years of post-conviction credits totaling

10  62 months.  And the post-conviction credits were

11  granted for each year that you did not have a

12  115 and you have had no 115s since your

13  incarceration.  Bringing us to a total period of

14  confinement of 160 months.  Special conditions

15  of parole.  That you do not use or possess

16  alcoholic beverages.  That you submit to alcohol

17  testing.  That you participate in a substance

18  abuse program such as AA or NA. and in your

19  case the panel is recommending that you

20  participate in AA.  And that you report to a

21  parole outpatient clinic for evaluation.  The

22  panel also as a special condition is noting that

23  your parole plans, your primary parole plans for

24  housing and employment are in San Bernardino

25  County and the panel is authorizing parole to

26  San Bernardino County.  So far as the reason for

27  **MICHAEL JONES E-40401   DECISION PAGE 7   05/01/06**

66

1   the imposition of the special conditions.   It is

2   the relationship of alcohol to the commitment

3   offense.   And with respect to the special

4   condition of parole to San Bernardino County,

5   it's where you have the most valid parole plans,

6   particularly with respect to the offers of

7   housing and employment from your cousin.   As

8   I've indicated, this is a trip you're going to

9   start on right now.   There's a lot of people

10  that are going to be reviewing this, up to and

11  including the Governor.   You're going to need to

12  be especially good on your behavior between now

13  and when you get the word.   There's some people

14  that may be jealous of what you've achieved and

15  I would encourage you to kind of just be a very

16  low profile individual.   I think that's not

17  going to come difficult to you because you seem

18  to have done that since you've been in, avoiding

19  all of the difficulties oftentimes encountered

20  being incarcerated.   Commissioner Blonien, any

21  comments?

22        **DEPUTY COMMISSIONER BLONIEN:**   As we were

23  going through the hearing I noted that you were

24  a great worker.   You are highly skilled, highly

25  motivated.   I was very impressed that you had

26  crafted your self-help treatments with the

27  **MICHAEL JONES E-40401   DECISION PAGE 8   05/01/06**

67

1  emphasis on anger management and your alcohol

2  problem, both which were your major problems

3  that allowed you to commit this horrible crime

4  and you have done numerous self-help in that

5  arena.  Of your 14 college courses you took

6  you've got ten A's and four B's, which is very

7  impressive.  In addition you did the 100 video,

8  self-help videos, educational videos.  So that

9  is all very impressive.  You know, you look at a

10  C File and you see one thing but you also

11  presented yourself extremely well and very

12  articulate today and I wish you the best of

13  luck.

14       INMATE JONES:  Thank you.  Thank you.

15       PRESIDING COMMISSIONER GARNER:  Okay, the

16  time is now 3:25 p.m. and that concludes the

17  hearing.  Good luck to you, Mr. Jones.

18       INMATE JONES:  Thank you once again.

19  I'll make you proud, thank you.

20       PRESIDING COMMISSIONER GARNER:  We always

21  say, don't let yourself down.

22                 --oOo--

23  PAROLE GRANTED

24  THIS DECISION WILL BE FINAL ON August 29, 2006

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  MICHAEL JONES E-40401  DECISION PAGE 9  05/01/06

68

### CERTIFICATE AND
### DECLARATION OF TRANSCRIBER


I, RAMONA COTA, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 67, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of MICHAEL JONES, CDC NO. E-40401, on MAY 1, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated May 31, 2006, at Sacramento County, California.


RAMONA COTA

TRANSCRIBER
**PETERS SHORTHAND REPORTING**